Filed 3/24/25  In re S.P. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| In re S.P. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E083379 |
| Plaintiff and Respondent, | (Super.Ct.Nos. J284438, J284439, J287862, J287863) |
| v. | OPINION |
| C.P. et al., | |
| Defendants and Respondents; | |
| G.C., | |
| Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Cara D. Hutson, Judge.  Affirmed.

Jamie A. Moran, under appointment by the Court of Appeal, for Appellant, G.C.

1

Tom Bunton, County Counsel, and Dawn M. Martin, Deputy County Counsel, for Plaintiff and Respondent.

INTRODUCTION

After C.C. (mother) failed to reunify with her four children, the juvenile court appointed Gladys C., the maternal grandmother, as the children's legal guardian under Welfare and Institutions Code section 366.26. Nearly a year later, the juvenile court granted the San Bernardino County Department of Children and Family Service's (the department) section 388 petition to terminate the guardianship because the children had suffered multiple, nonaccidental injuries in Gladys's care and Gladys was allowing mother to have unsupervised contact with the children.[1]

On appeal, Gladys argues that we must reverse the order terminating her guardianship because the record does not contain sufficient evidence that the department made "reasonable efforts . . . to prevent or to eliminate the need for removal" within the meaning of section 361, subdivision (e). Because a juvenile court is not required to make such a finding before terminating a legal guardianship established under section 366.26, we affirm.

---

[1] Unlabeled statutory citations refer to the Welfare and Institutions Code.

2

FACTUAL BACKGROUND

A.    *Dependency Proceedings Culminating in Gladys's Appointment as Legal Guardian*

The subjects of this appeal are mother's four children—her two older daughters E.C. and S.P. (who are now 13 and 9 years old, respectively) and her two young twins E.T. and En.T. (who are now 4 years old).  The department began investigating mother for drug use in January 2020, before the twins were born.  Mother admitted using ecstasy, oxycodone, and methamphetamine, and she was arrested for child endangerment when police found drugs at her house.  During an interview with the social worker, E.C., S.P., and their half-sister, D.C. (who is not a party to this appeal), reported that mother would "slap and punch them while they were sleeping for no reason."

After the department filed section 300 petitions on behalf of E.C. and S.P., mother informed the social worker that she did not plan on reunifying with her daughters.  In July 2020, E.C. and S.P. were placed with Gladys, and mother expressed her desire that Gladys adopt the girls or become their legal guardian.  In October 2020, the juvenile court took dependency jurisdiction over E.C. and S.P. under section 300, subdivisions (a) and (b).  The juvenile court found that mother physically abused both girls and that mother's untreated mental health and substance abuse issues placed the girls at risk of harm.  The court removed the girls from mother's custody, and mother waived reunification services.

In January 2021, mother gave birth to E.T. and his twin sister En.T.  Later that same month, the twins' father, D.T., called the police on mother and reported that she had

taken an excessive amount of hydrocodone. Police responded to the home and arrested mother for having an active warrant on the child endangerment charge from 2020. Later that month, the twins were detained and placed with Gladys.

In March 2021, the juvenile court took dependency jurisdiction over the twins, removed them from mother, and placed them with father on the condition that he reside with Gladys and participate in family maintenance services.

In August 2021, mother asked the social worker if she could move in with Gladys. The social worker said no because the children were living with Gladys and the juvenile court had found that it was not safe for the children to live with mother. Several days later, mother was arrested and incarcerated. In November 2021, father informed the department that he was not able to care for the twins and expressed his desire that Gladys become their legal guardian.

The court held a section 366.26 hearing for all of the children on December 13, 2022. The court adopted legal guardianship as each child's permanent plan, appointed Gladys as the children's legal guardian, and ordered supervised visits for mother at a minimum of two times per week for two hours.

B.      *Termination of the Guardianship*

About eight months later, in August 2023, the department received a referral alleging that mother had been living at Gladys's home since she was released from prison and that mother was physically abusing the children. The social worker interviewed Nathalia, a maternal aunt, who had recently moved out of Gladys's house. Nathalia said that mother stayed at the house and would get irritated with the children, yell at them, and

4

hit them with various objects. Nathalia showed the social worker two photographs of E.T. (who was then two years old) with what looked like a bite mark on his face. She said that she had been told that En.T. fell of the bunkbed and injured her head.

Gladys admitted to the social worker that mother sometimes stayed at her home but denied that she lived there fulltime. Gladys also admitted that she had left the children in mother's care while she ran errands on a few occasions. Regarding the mark on E.T.'s face, she said it was probably caused by En.T. because the twins would fight with each other.

The social worker interviewed E.C.'s paternal grandfather, who believed that mother had been living with Gladys for the last month. He said that Gladys had told him that mother acted like a " 'zombie' " and had almost burned her house down by forgetting to turn the stove off.

Mother denied hitting the children and told the social worker that she was living with a friend, but she refused to give the social worker the friend's address.

The social worker interviewed mother's older daughters, E.C., S.P., and D.C., at school, and the girls said they never saw anyone hit the twins. The girls also said that they could not remember the last time they saw mother, despite the fact that Gladys told the social worker that mother had visited the previous week.

On August 23, 2023, the social worker and a sheriff's deputy conducted a home visit at Gladys's house. Gladys was "combative" throughout the interview and refused to provide medical information about the children. She was resistant to discussing mother's court-ordered supervised visits and claimed that she "doesn't understand the visiting

5

parameters between biological parents and children." When asked about En.T.'s head injury, Gladys said that she was in the other room when it happened but took En.T. to the hospital because En.T. "appeared to be in a different state of mind." Gladys refused to sign a medical release form allowing the department to review the children's medical records.

The social worker observed that Gladys became increasingly angry over the course of the interview. She told the social worker that she held "the sole power" to make decisions. She said that they had decided "as a family" against adoption because the process was "too long." She said that the family had agreed to a guardianship "to stop having oversight or involvement with the department." The social worker believed that Gladys was being sarcastic when she claimed she was confused about mother's visitation schedule. After the home visit, a nurse examined the children and found on E.T. a "small, brown circular discoloration" on his left forearm and a scratch on his back. Gladys said the injuries were caused by E.T. and his twin sister.

On September 7, 2023, the department received a referral alleging that E.C. and D.C. were being physically abused and that D.C. had a scratch below her right eye and bruising on her right leg. Gladys said the injuries involved " 'kid stuff.' " Contrary to what she had said about mother's visits previously, Gladys told the social worker that mother was visiting the children for the first time in three months that day.

Over the next several days, Gladys hired an attorney and failed to respond to the social worker's many phone calls and text messages. On September 14, 2023, the department sought and obtained a detention warrant for the children. That same day, two

social workers and a sheriff's deputy arrived at Gladys's home to execute the warrant. Mother answered the door with the twins. After mother was unable to locate Gladys in the home, the deputy found her in a separate guest house in the backyard. When the department took custody of the children, E.C. and S.P. told D.C. not to give any information to the social workers.

D.C. and the twins had "extensive scarring and abrasions on their bod[ies]" and were transported to the hospital for emergency medical treatment. E.T. had abnormal bruising, "patchy" hair loss, multiple abrasions on his face, and what appeared to be a slap mark "in the shape of fingers" on his face. En.T. had abnormal scarring on her chest, arms, back, and stomach, and a closed fracture of her parietal bone. D.C. had a large scar on her face that she could not explain. She had two recent lacerations on her head, an inflamed bladder, and multiple older lacerations. D.C. told the medical examiner that she lived in the main house with mother and her siblings, and that Gladys lived in the detached guest house. She said that mother was their primary caretaker and Gladys was not in the main house very much.

On September 18, 2023, the department filed section 387 "supplemental" petitions on behalf of the children, alleging that placement with Gladys was no longer appropriate because she allowed mother to have unsupervised contact with the children, in violation of the court's visitation order. In a detention report filed the same day, the department informed the court that it was also investigating Gladys as the result of a referral involving Gladys's teenage daughter, and that Gladys was being uncooperative in that case as well. The department noted that Gladys had a history of child welfare issues. In

2004, an allegation of neglect was substantiated against her for failing to protect her children from their father, who was arrested for willful cruelty to a child. In 2014, all of her minor children told the department that there was domestic violence occurring in the home, as well as other violent behavior associated with alcohol dependency.

On September 20, 2023, the juvenile court detained the children from Gladys and ordered the children's assessment center (CAC) to conduct forensic interviews and medical examinations of the children.

E.C.'s paternal grandparents told the social worker that they had seen E.T. with a black eye in August 2023. Gladys had told them that En.T. had caused the bruise, but they did not believe her. The paternal grandparents suspected that E.C. had been exposed to sexual acts based on conversations they had overheard between E.C. and mother.

The maternal aunt said that while she was living at Gladys's house, mother was at the home often, and the children would tell Nathalia that they did not know where Gladys was. The maternal aunt said that she saw mother hit the children, but she refused to give any more detail on the issue. D.C. said that mother had been living at Glady's house " 'for a long time.' "

S.P.'s caregiver said that S.P. was very " 'parentified' " and would lie about " 'silly things.' " S.P. had two broken teeth but claimed no knowledge of how it had happened. E.C. wrote a statement admitting that she had kissed S.P. on the lips and touched her " 'top hal[f].' " S.P. said that E.C. had not touched her since they had been detained but that E.C. " 'used to touch me all over my body all the time.' " S.P.'s caregiver believed that S.P. was scared of E.C. The twins' caregiver reported that they

8

were not aggressive toward each other and that neither of them tried to pull E.T.'s hair out.

During her CAC forensic interview, S.P. disclosed that E.C. sexually abused her when they were living with Gladys by kissing her on the mouth and touching her vagina and buttocks under her clothes. S.P. also saw E.C. molest D.C. on one occasion, and when D.C. told E.C. to stop, E.C. said, " 'shut up and let me finish' " and slapped D.C. S.P. said that when she reported the abuse to Gladys, E.C. had to sleep in the living room. S.P. denied any physical abuse, but her medical examination revealed scars and bruising on her body that were deemed nonaccidental.

The forensic pediatrician who examined the twins determined that their injuries resulted from nonaccidental causes that did not include sibling aggression. Regarding a large linear scar across D.C.'s forehead, the pediatrician opined that it could not have been caused by " 'a large heavy pot falling,' " which was the explanation Gladys had given to D.C.'s doctor.

On December 5, 2023, the department filed section 388 petitions on behalf of the children, asking the court to terminate Gladys's legal guardianship and set a section 366.26 hearing to select new permanent plans for the children. The department alleged that it was in the children's best interest to terminate the guardianship because Gladys was not able to safely care for them.

The next day, the department filed amended section 387 petitions on behalf of S.P. and the twins, adding the allegation that the children sustained multiple nonaccidental injuries while in Gladys's care and were thus at substantial risk of harm. On February 16,

9

2024, the department filed second amended petitions on behalf of S.P. and the twins, adding the allegation that Gladys failed to protect the children from being sexually abused by their half-sister, E.C. The agency recommended terminating the guardianship because Gladys had demonstrated that she was not able to safely care for the children.

The court held a hearing on the section 387 and 388 petitions on February 20, 2024. Gladys was the sole witness. She testified that she was "home all the time," and she denied the allegation that mother had been living at her house and acting as the children's primary caregiver. She denied that mother ever had any unsupervised contact with the children or stayed the night at her house. Asked about the multiple injuries to E.T., Gladys said that the only injury she saw on the child was the mark on his face, which she said was caused by his twin sister biting him. Asked about En.T.'s multiple injuries, Gladys said that the only ones she knew about were caused by swimming. She said that En.T. liked to swim and would get scratches on her chest from the cement edging on the pool. She said that E.C.'s injuries were caused at school because E.C. was bullied and "[k]ids would hit her." She denied seeing any injuries on S.P. and said that she took the children to the doctor "every month." She said that she had cameras set up throughout her house, and so it was "impossible" that she did not protect S.P. and the twins from E.C.'s sexual advances.

On cross-examination, Gladys was asked if she had read the part of the department's report containing D.C.'s statement that mother lived in the front house with the children and she lived in the guest house in the back. Gladys responded that she had received the department's report but had not read it. When asked about the time that E.T.

10

had a black eye, Gladys said that it was just a "little red thing on the side of his eye," not a black eye. Gladys admitted that she had seen camera footage of E.C. on top of S.P. in bed, but said that S.P. was free to sleep in her siblings' room or the living room if she did not feel comfortable sleeping in the same room as E.C. Gladys could not recall the frequency or duration of mother's visits, but she said that they were always supervised. When asked if she believed that mother was a risk to the children, Gladys responded, "I'll say yes."

Counsel for S.P. and the twins agreed with the department that the legal guardianship was detrimental to the children and should be terminated. Counsel for E.C. did not disagree that the guardianship should be terminated, but she informed the court that E.C. had expressed a desire to visit mother, and Gladys and argued that visitation, if ordered, should be supervised.

The juvenile court ruled on the section 387 petitions first then turned to the section 388 petitions. Regarding the section 387 petitions, the court found all of the allegations in the petitions true and found by clear and convincing evidence that removal from Gladys's home was necessary to protect the children from a substantial danger to their health and safety. Regarding the section 388 petitions, the court found that Gladys's legal guardianship was detrimental to the children, terminated the guardianship, and selected adoption or guardianship as the children's permanent plan.

DISCUSSION

Relying on *In re H.B.* (2024) 106 Cal.App.5th 219 (*H.B.*), Gladys argues that the order removing the children from her home under section 387 must be reversed because

11

the record does not contain sufficient evidence that the department made "reasonable efforts" to prevent the need for removal within the meaning of section 361, subdivision (e). Gladys argues that when ruling on the department's section 387 petition, the juvenile court was required to apply section 361, which requires the court to "make a determination as to whether reasonable efforts were made to prevent or to eliminate the need for removal." (§ 361, subd. (e).) We disagree.

Even if we assume for the sake of argument that the court was required to make a "reasonable efforts" finding under section 361, subdivision (e), before removing the children under section 387, Gladys's argument still fails. This is because Gladys does not attempt to identify what steps the department could have taken, but did not, to avoid removal. Given that she denied the allegations against her and was combative and uncooperative with the department during its investigation, we cannot imagine any efforts the department could have made to avoid removal. Gladys's reliance on *H.B.* is misplaced, because the father in that case acknowledged that he was suffering from untreated substance abuse issues, was cooperative with the department, and wanted to participate in treatment. (*H.B.*, *supra*, 106 Cal.App.5th, at pp. 231-232, 246.)

Moreover, even if Gladys could show error with respect to the section 387 petition, she cannot demonstrate that she was harmed by the error. This is because the court also terminated the guardianship, which was Gladys's sole basis for custody, and termination is governed by section 388, not section 387. (*In re Carlos E.* (2005) 129 Cal.App.4th 1408, 1418 (*Carlos E.*); see *In re N.B.* (2021) 67 Cal.App.5th 1139,

12

1145 (*N.B.*) [Section 388 provides the "proper procedure" for terminating a guardianship established under section 366.26.].)

Guardianships established by the juvenile court during dependency proceedings are different than guardianships established by the probate court. (*Carlos E.*, *supra*, 129 Cal.App.4th at pp. 1420-1421.) Gladys was appointed legal guardian under section 366.26 after mother failed to reunify with the children, and the court selected guardianship as the children's permanent plan. When a guardian is appointed under this procedure, the juvenile court "retains jurisdiction" over the minor as a ward of the guardianship under section 366.3, even after the juvenile court terminates dependency jurisdiction under section 300. (*N.B.*, *supra*, 67 Cal.App.5th at p. 1145, citing Welf. & Inst. Code, § 366.3, subd. (a)(3).) "Section 366.3, subdivision (b)(2) and California Rules of Court, rule 5.740(d) set forth the procedure to terminate such guardianships." (*N.B.*, at p. 1145, citing *In re Alicia O.* (1995) 33 Cal.App.4th 176, 182.) California Rules of Court, rule 5.740(d)(4), provides that any request to terminate a guardianship must be made with a section 388 petition.

Section 388 does not require the juvenile court to make removal findings under section 361 before terminating a guardianship established under section 366.26. Rather, the juvenile court must find that there has been a "change of circumstances" and that terminating the guardianship "would be in the minor's best interests." (*N.B.*, *supra*, 67 Cal.App.5th at p. 1146, citing Welf. & Inst. Code, § 388, subd. (a).) As a result, Glady's claim of insufficient evidence of "reasonable efforts" to prevent removal, within

13

the meaning of section 361, subdivision (e), provides no basis for reversing the court's order terminating the guardianship.

For these reasons, we reject Gladys's challenge to the court's ruling on the section 387 petition.

DISPOSTION

The juvenile court's findings and orders of February 20, 2024, are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

FIELDS_____
Acting P.J.

We concur:


RAPHAEL_____
J.


MENETREZ_____
J.

14